Hatwood, J.
delivered the opinion of himself, and Williams and Peck, Judges, (a)
The two first counts of this declaration may at once be laid out of the case, being not supported by evidence, as it is admitted on all hands. The third count, the one upon which the jury have found their verdict, is supposed also by the counsel on one side not to be supported by evidence, and to be one in respect of which the court *394 gave to the jury a wrong direction in point of law. The error is taken to be, that in stating to them, that if Walter Wilkerson and James J. Wilkerson were partners, that then a lease made by Walter Wilkerson and Bryan, supports the description of a lease made by James Joseph Wilkerson and Bryan to the defendant. They believed no doubt that the partnership existed. Was this a wrong direction? and if so, what is the legal consequence? It may be true that Walter Wilkerson might by this contract bind his partner, James Joseph Wilkerson; and at the same time, it may not be true that the contract was made by James Joseph Wilkerson. A, B and C are partners. A signs a note in the name of the firm, B, C and Co. and the plaintiff states the note to be signed by A, B, C and Co. This is not true, though it will be in-dispon b!y true that A, B and C are all bound. 7 Johnson, 463. In such case, it would be the duty of the court to nonsuit the plaintiff, and to make him set forth the fact as it really is, before he should be permitted to recover. Every contract sued upon should he described with distinguishing features, that it may he compared with the same contract if hereafter sued upon, and described by the same rule. Let the rule in one instance be disregarded, and it might soon be in many others; or for want of exactness in the description, a formal recovery for the same cause could not be pleaded in bar to a second, or other subsequent action. This inconvenience and injustice is obviated, by requiring a minute description of the contract, with the circumstances which characterize and identify it, and evidence precisely corresponding with it. Another useful end attained by this precision is, that the defendant is apprized of the precise evidence intended to be produced against him. But if something may be proved which is not staled, and of the intention to produce which, therefore, he cannot be notified, of course he cannot be prepared to repel it, even though it be not true. In the case of the note signed with the name of the firm *395 by a partner, had the fact been stated that all were char-g«d, because one who was a partner signed the name of the firm, the defendant might have gotten evidence to disprove the existence of the partnership, and to show that the specified contract had been in some way discharged. Therefore it was, that the liability of A, B and Co. could not be proved by the unspecified fact of a partnership. So here the evidence of the partnership might make Wilkerson liable, yet it ought not in justice to be proved by the un-alleged fact of a partnership between Walter Wilkerson and James J. Wilkerson. Though had the fact been alleged, the evidence would have been both relevant and effectual. Chi tty’s Pleadings, 224, 304, and the numerous authorities there referred to. The evidence varied from the description of the contract specified, and was not the less so, though a partnership existed between Walter Wilkerson. The charge of the court was erroneous. What is the legal consequence of the error? At the common law it would be a reversal of judgment. By the act of 1809 the judgment is not to be reversed but for some cause af-fjeting the merits; that is, if the plaintiff be entitled to recover for the cause of action staled in the declaration, or the evidence produced to establish it. When the inquiry is made, whether a judgment can be affirmed merely because the evidence shows it to be intrinsically right, without reference to the pleadings, the proper answer seems to bo in the negative. For if the evidence prove damages in trespass, waste, or nuisance, to the amount of the judgment rendered in assumpsit, it would be right and just, that the plaintiff should have the money abstracted from all other considerations but the simple merits of the plaintiff. But in reference to the mode by which he had obtained the judgment, it would be improper and unjust, because the rules of law which were framed to pre* vent surprize arid imposition upon him, had been disregarded, and by means thereof it had become uncertain whether a just result had been deduced from the irregu- *396 Jar investigation which had been employed to produce it. In reference to the example of confirming such a judgment, the disregard of rules invented for the security of the suitors, would he similar, and the security diminished from time to time by a repetition of instances, till nothing would be left but the discretion of the judge. Another and another judge may give similar charges, going a little and a little further, till finally nothing will be regarded but the innate justice of the judgment, determined by such evidence as appeared on the trial. And ultimately all such judgments, however unfounded upon the action as stated in the commencement, and however unconnected with it, would be affirmed. Admitting that a judgment is reversable, because not founded upon the action proper for the evidence that produced it, is it not then as necessary that the evidence should fit the count, as that it should fit the action? It is so, or otherwise the evidence which fitted an action on the case for a wrong, would be good evidence by which to get damages in assumpsit. If such evidence is not admissible in assumpsit, because not legally suited to it, so neither if there be two counts in as-sumpsit, and the evidence suit one of them only and not the other, could it be applied to the count it did not suit, any more than it could he to the action it did not suit; and if not applicable to one of the counts which it did not fit, so neither could it be applied to either, when it did not fit either, but some other not stated in the declaration. The merits of the cause, then, spoken of in the act of 1S09, are merits not only per se, and independent of all extraneous considerations, but also in reference to the steps by which the plaintiff acceded to its acquisition. It ought not to stand if acquired by other than the regular ones, adopted into the legal system to protect both parties against surprise and unfairness. This judgment, therefore, so far as it stands upon the foundation of the third count, cannot be supported. The jury have found the issues severally in favor of the plaintiff, and have as *397 sessed damages accordingly. They are assessed upon this count as well as the others. The jury have not been instructed to disregard it, but have been left at liberty to proceed on it in case of their belief of a partnership between Walter Wilkerson and James Joseph Wilkerson. We are obliged to see from this finding, that they have gone upon it. Weighing the merits of the judgment with reference to the aptness and sufficiency of the evidence, we think that the judgment must be reversed for the misdirection of the judge. 4 Term, 753; 1 Bos. and Pull. 339.
The fourth and fifth counts, for a quantum meruit and quantum valebant, came next into view. It may not be amiss to observe, that if there be any special agreement, whether that stated in the declaration or not, there cannot be a recovery upon these general counts, unless such special agreement were exactly conformed to them. For example, if the evidence shows that the defendant made a special request to be permitted to occupy, and was permitted by the plaintiff, and then proved a promise to pay as much as the plaintiff deserved to have, such evidence would support these counts, but evidence of a particular price agreed on would destroy them. 1 Term Rep. 735; 4 Esp. 213. The fifth count is for lead ore sold, &c. and is not relied on, and may be laid out of the case. Whether this cause shall be remanded to the circuit court, to be proceeded in de novo, and to the end that such amendments will be permitted by the court as will bring forward the merits, depends considerably upon the question whether by the rules of law the plaintiff be entitled to recover in some form upon the evidence which he has offered. This leads to the enquiry whether the plaintiff be entitled in law to recover or not, upon counts properly adapted to his case. If the common law upon the subject be the standard of decision in Missouri, as it is here, the question can be immediately settled. If it be not, there should be a new trial, to the end that the law of *398 Missouri may be correctly ascertained through the proper medium. Takiiig the common law to be in use there, and the defendant to have come into possession under the plaintiff, Smith, and to have promised a certain reward, unconditionally, as some of the evidence states, and as may be the fact, then the plaintiff ought to recover against him; because, one who has come in under another as his landlord, by an express contract, and has occupied under him, cannot be allowed to prove, that the title is not in his landlord, but in some other. He has undertaken to preserve the possession of the landlord, and to redeliver if, and he cannot do otherwise, without the violation of his plighted faith, and without destroying that confidence in promises which is the solid foundation of contracts and of the consequent accommodations flowing from them, which so much contribute to the comforts of mankind. Who would entrust another with the possession of a tenancy, if the tenant could at pleasure transfer the possession to the adversary of his landlord, by payment of rent to him, or by taking a lease from him, or by other act re-cognising the stranger as his landlord? In a moment, as it were, all tenancies would be at an end, and those who had no houses or lands of their own, would not be received upon the lands or into the houses of others. Who would be a landlord, if his tenant had a right by law to change his possession, and to force him through the devious windings of a lawsuit, travelling from court to court, and subjected to all the casualties incident to its various stages? The poor would be driven, if such were the law, to live in dens and caverns, for fear of the ruin he might bring upon his unprotected landlord. For these reasons it is, that the law will not suffer a tenant to dispute the title of his landlord, whenever he has by an express contract recognised him as such. Smith, therefore, would be entitled to recover on such evidence as is in this record, if the jury should believe it. 1 Term, 387; 5 Term, 4; 4 Term, 682; 4 Haywood, 207. If a different law on *399 this subiect prevail in Missouri, that may be shown on a new trial: at present we are not mlormed of it, and cannot be governed by it. The laws of Missouri, before it became a part of the Union, should be proved as facts from the best sources, such as eminent jurists, and other legal characters who have had opportunities to become experienced' in them, as well as by the public documents of the country. The same evidence in regard to the construction and- practice upon the written laws, made since the acquisition of the country by the United States, might be very proper and useful. 'With such helps, upon a new trial, if this court now labors under a misapprehension of the law upon any point, the cause might be correctly decided, and with as much satisfaction as other cases. In any case whore the law is not clear, and may have been mistaken, that alone is a reason why there should be another investigation, and a better opportunity given to collect the necessary information, which will enable the court to pronounce satisfactorily and with judgment upon the rights of all the parties concerned. 1 Bur. Reports, 293-4-5.
This right of the plaintiff to recover, however, is supposed to be totally subverted by his entry upon the premises. Such interference, unless the tenant be wholly evicted and expelled from the possession, is not a discharge from payment of the stipulated compensation; but makes the enterer upon his possession a trespasser liable to make satisfaction for the damages in the appropriate action. The relation of tenant continues so long as the tenant holds over, and the tenancy is not put an end to by the legal ceremony appointed for that purpose. The tenant came in first for a year, and is continued from year to year. It is supposed to be overturned likewise by acts of Congress of 1804, 1S07 and 1811, inflicting larking the ¿0 mu-hi. *400 which may be legally done by way of asserting and maintaining title by such as claim it. It could not be the meaning of Congress to prohibit claimants from doing them, as these are the means appointed by law for the vindication of title. Congress could not mean to punish a man for asserting his title in a legal way, but only to punish those who, without any claim, intruded upon the public domains. If it be required of a circuit Judge to charge upon a matter of law material for the jury to understand, in order to form a correct opinion upon the point before them, he cannot decline giving it, and must give a legal and a right opinion. One of the errors assigned in this case, is, that the Judge, though requested, would not charge what the law was,'in case the jury believed that the express contract made by the defendant was a conditional one, to pay the plaintiff if he had title: to which the Judge replied, “He would not charge except as above,” referring to that part of the charge where he speaks of the title, and says it was a good one. The assignment of error for want of a charge, or refusing to charge, is not founded in fact. Very probably upon this charge the verdict was given; and if so, it was wrong; for he ought to have told the jury, that there being no count which fitted the evidence, that it could have no effect in favor of the plaintiff, he having not stated a conditional contract in his declaration, and having not claimed any benefit under it; and that as it superseded and disproved all the other counts, that they ought, if they believed this evidence, to find for the defendant. Why state the title to be good, unless to show aright to recover according to the conditional evidence? The charge ought to have been, pay no attention to {this evidence, and make no inquiry concerning the title. It is very possible, if not even probable, that the conditional evidence, and the charge in favor of the title, were combined by the jury, and that the verdict was given without reflecting that there was no count which it supported. *401 And if the charge may have misled the jury, the judgment ought not to stand. In case of a new trial in the Circuit Court, upon new counts added, one of which shall state a conditional contract, to pay the sum specified if Smith had title, and in case the evidence to that effect shall be believed by the jury, then it will be proper to go into the title, and to consider whether the sentiments of Judge Stuart, expressed upon the trial of this cause, were proper.
The Spanish regulations made in 1797, by Governor Gayosa, and those by Morales in 1799, evince the usages and customs which prevailed before those periods; and in the year 1796, when the concession of that year was made to St. Vrain, by the Baron de Carondelet, the then Governor-General of Louisiana, lands were distributed into three ordinary classes, and also into some extraordinary ones. Lands in the ordinary classes, were those sold, those conceded, and those distributed. Those conceded, were to be followed by orders or decrees of survey, measurement and demarcation, with delivery of possession; after which followed a title, issued by public authority. Possession was divested out of the King by the concession; and rights were claimed, or supposed, according to popular opinion, to be perfect, after the decree of survey and possession taken, though the title were never applied for; and concessions were made upon condition of settling and clearing the land. After the concession obtained, it was usual to make conveyances, and for the officers of government to receive acknowledgments of them, and to authenticate. All these disorders were repressed, and forbidden for the future, and concessions were to be followed by orders of survey, copies of which were to be annexed to the title; the concession itself being recorded in one book, the order and certificate of survey in another, and the title in a third. The extraordinary cases mentioned in the regulations, the lat *402 ter seem not to havé governed. Formal titles made by the Spanish governors after the cession of Louisiana by France to Spain are confirmed; what these were, is not evident; but they were imperfect titles which needed confirmation, otherwise they would not have been confirmed as they were. The concession of St. Vrain seems not to be embraced by the regulations for ordinary cases, made in 1799. In it, the condition of settlement is dispensed with, because of exposure to the Indians; and of course, all that was to precede a settlement, and to follow, was dispensed with: the decree of survey; the survey itself, measurement and marking of boundaries, within the limits assigned for ordinary cases; the delivery of possession; the clearing of a part of the land; and continuing three years in possession. These were not confined within limits. How could they be done immediately upon the lands occupied by the Indians, or which were in their vicinity? But still, at some future time, the title was to be perfected. In the mean time, the holder of the concession was entitled to the possession, which either he might take, or it might be delivered to him by a public officer. If such was the nature and effect of the concession in question, however it plight differ from the ordinary course of proceeding, it could not be revoked or divested of any immunity or privilege useful to the holder. How could a subsequent agent of the Crown, impose conditions upon the concession, from which, before, it was exempted by an authority equal to the end? The presumption is, and it must stand till the contrary be shown, that the concession and the exemptions were made by competent authority. The Governor General would not have made them without. The regulations of 1799 were adapted to the sales and settlement of the land which the government wished to dispose of, not to cases which affected the mines, which probably belonged to the Royal Domains that were reserved from individual ap *403 propriation. Why make known, by a survey and settlement, which of these were included in grants of individual appropriation? In other cases it was proper, that the unappropriated residue should appear, in order to be seen by those inclined to purchase, but was of no use or benefit, where, by the law of the country, no one was allowed to purchase any part of the residue, however well it might be distinguished; and it was of course immaterial to the government and to the people, whether such residue were made known or not. Taking the present concession to be an incipient title, which gave to the holder and his assignee the right to identify, and to possess the objects upon which it operated, according to the terms expressed on its face, and discharged from the conditions annexed to ordinary concessions, the United States engaged by the treaty of 31st August, 1803, to protect the inhabitants in their rights of property. And even without this express stipulation, they would have been bound to do so by the maxim received amongst civilized nations, that a change of sovereignty makes no alteration in the rights of individuals. Upon the transfer of the sovereignty of Louisiana to the United States, the latter acquired a right to the territory, subject to such anterior right as the former government of Spain had conceded to individuals, and subject to their claims, in the same manner, and to the same extent, in all respects, as the government of Spain was subjected. If this latter government was bound to esteem valid the privileges and exemptions which were annexed to the concession of 1796, made to St. Yrain, and comprehended in it, the United States were bound likewise to esteem them valid, and could not detract from them any more than the government of Spain could. Say that the concession was unreasonable; yet was not Spain under great obligations to make a bountiful provision for him? He had adhered to the cause which Spain espoused; had been driven from his country for *404 his adhesion; had been deprived of his honors and his fortune; had sought an asylum in the American provinces of Spain; and had there proved, on a trying emergency, bis devotedness to her cause, against his own countrymen, for being her enemies. If it still seem unreasonable, the government of Spain had power to make it, and was the best judge of the duties she had to perform, and the lengths to which she would go, under the influence of generous impressions in his favor. If it vary from ordinary concessions, that variance the government could lawfully establish. If productive of inconvenience from its exuberant liberality, the government which made it could best determine whether it suited her obligations or her circumstances. The United States are subject to all the inconveniences which naturally spring from the conceded privileges, and must take the territory with them as a part of its appendages. The United States may reserve to themselves the lead mines of the country, but liable to the drawbacks and disadvantages attached to them in the hands of Spain, at the time of the concession made by her. Possibly, these ideas may not be the correct ones; and if so, they may be shown to be so by such testimony as is before adverted to in the present opinion.
It is next to be seen in what light this claim has appeared to Congress, and what has been done by the United States to affect the title derived under the concession made to St. Vrain-.
After endeavoring to prevent by an act of 1804, occupancies and occupant claims to pre-emption in future by illegal intrusions upon the public lands, which had been acquired to the United States by the treaty of 1803, Congress began to prepare in 1806, for the discharge of the obligations which had devolved upon them by the treaty and cession of 1803, and particularly for the satisfaction of claims existing at the date of the treaty: And next, to prepare to make disposition of the lands which *405 should be left unexhausted, after the satisfaction of those claims. All claims by virtue of legal Spanish grants, completed before the 1st of October, 1800, were to be notified in writing to the Register appointed in pursuance of that act, and the grants and mesne conveyances were to be delivered to him; and in case of incomplete grants, were to be recorded in a book to be kept for the purpose. Commissioners appointed under this act, with the Recorder, were to hear and determine upon all matters relating to claims, and were to report to Congress upon all valid claims, and upon all rejected ones, with the evidence accompanying the same. They were to report on claims, which, though not sanctioned by the laws of Congress, ought, nevertheless, in the opinion of the commissioners, to be confirmed, in conformity with the Spanish laws, usages and customs of the Spanish government; and also to report upon claims neither supported by acts of Congress nor Spanish usages. Confirmed claims were to be surveyed and granted. Townships were laid off for sale, and in 1811 were offered for sale, with the exception of salt springs and lead mines, which were reserved for future disposal; and excepting also, till after the decision of Congress thereon, lands, the claim to which had been filed and presented to the Recorder of land titles, for the purpose of being investigated by the commissioners. Forfeitures of rights for settling on lands ceded to the United States, or for surveying, or causing them to be surveyed, or for marking boundaries or otherwise, until duly authorized, are excluded, with respect to rights, titles or claims in Louisiana, till after the report made by the commissioners, anduntila decision made by Congress on them. The effect is, to permit the claimants in Louisiana, until their claims be decided upon, to do all the prohibited acts, at least without forfeiture, and to have the privileges of owners forever, if those claims should never be decided on by Congress. There is no forfeiture on *406 Smith for settling upon lands including the Mine Shibo- , , \ ° . , , leth, or lor causing the same to be occupied, possessed or settled, or for causing the same to be surveyed, being of the description of land mentioned in the proviso to a saving of the act of 1807, upon which Congress have not yet made any decision, and possibly never may. Congress have not declared this claim to be void; nor could they do so, except so far as to withhold confirmation from it. For independently of this circumstance, the title can only be declared void by a judicial determination, made by a court having jurisdiction over the land in question. A court in Tennessee can only notice it as incidental to a question properly before it, and because, without a decision of the previous question, the main one cannot be reached.
The acts of Congress neither could nor have intended to place this claim upon grounds less advantageous to the plaintiff, than he would have occupied had no act been passed by Congress. The claim stands with respect to all adverse titles, and without any view to the favorable interference of Congress, precisely as it did on the first of April, 1803. If then completed, it needs not the confirmation of Congress; if not complete, it yet entitles the complainant to possession, and of course to make leases and entries upon the lands. For this reason it is, that the forfeiture inflicted upon others by the act of 1807, for possessing, or selling, surveying or marking these lands, or for causing the same to be occupied, possessed or settled, is not inflicted upon claims of this description. Such is the result which seems to follow from the view of the premises which has been just taken, and would seem rather to accord with, than to impugn the opinion which the Judge of the Circuit Court gave upon this point.
We now come to objections of minor importance, and might save ourselves the trouble of speaking upon them, having grounds enough for sustaining the opinion we give; *407 but upon a new trial, the same objections may be made, and may again come before us to be decided upon. It is proper to enquire, therefore, whether the depositions objected to were sufficiently proved to have been taken according to the rule of the court. It should appear by some means, that the commissioner sustained the character which the rule requires, that he was not interested, of counsel, &c. and that the deposition was in his handwriting, or in that of the witness. As soon as he appears to sustain the necessary character, the court will give credence to all he certifies, and if satisfied by a comparison of the signature with the body, that they are both in the same handwriting, will be convinced of the requisite fact, though it were better if expressly certified. But how is it to be known, that he is not interested, related, or of counsel, &c.? Hardly any one else can be able to speak of all these requisites; and if not otherwise sufficiently proved, it cannot be known but by his certificate. The only ground for presuming him qualified is, that otherwise he would not have taken the deposition. But he may have not known of the rule that disqualifies him. The fact, therefore, ought to be stated in the caption, or .in some other part of the deposition, if not otherwise proved by affirmative testimony, not only that he sustains the necessary character, but also the requisite qualifications, m not being subject to any of the disqualifications imposed by the rule. Cross-examination by the defendant, can only prove that he had notice of the time and place of taking the deposition, and nothing more.
As to the copy of the deed from St. Vrain and wife to Smith, taken from the recorder’s books, as it does not appear that there is any other office for the registration of such deeds, but only that of the recorder’s book from whence this copy was taken, and this book or copy from the original was taken under the care and superintendence of a public officer, of high and responsible character, the *408 fa;r presumption is, that the copy in the book is a correct one; and the one taken from it is sworn to be a true copy from it. The loss of the original is proved, both hy the loser and the owner of the deed and bargainee, and therefore a sufficient ground is laid for the introduction of a copy. The original, it must be perceived, was verified by some sufficient authentication, otherwise the recorder would not have received and registered it as an evidence for the commissioners and himself to act upon. This leads to the conclusion, that the copy was well given in evidence on the trial before the Circuit Court.
With respect to the testimony of persons who were partners with the defendant, they being liable to contribute to him their share of the recovery against him, could not in that situation testify for him; but when discharged from that liability, and being not parties to this action, the only cause for their rejection is removed, and the evidence is properly receivable.
Concerning the impressions of the witness at the time of the transaction, when there was nothing to efface them, and when no new objects had been presented to weaken his recollections, is only another mode of saying he is perfectly satisfied of the fact. It is right and proper to refer it to the jury, to fix the meaning of the witness, and to decide whether he intended thus to represent his recollections, or whether he meant to intimate that the images which were then created had since faded away, and according to the meaning which they should adopt to govern themselves.
As to' the evidence concerning damages by waste of timber, so much as is necessary to be used for smelting, the defendant had a right to use for that purpose: being included in the liberty to smelt ore, satisfaction for it is included in the price of the ore. If there be a waste beyond what is necessary, that would be recoverable in another form of action. But in fact, it is ascertainable by *409 calculations upon the evidence, what allowance was made for waste of timber; and though the evidence is not strictly proper, yet as it can be clearly shown that it did no harm, therefore there should not be a reversal for this irregularity.
Upon the whole, our opinion is, that this judgment ought to be reversed, and sent back to be proceeded on in the circuit court, which may permit the declaration to be amended, if it thinks proper, and the issues to be tried in conformity with the principles adopted in this present opinion of the Supreme Court.
Whyte, J. dissented.
Judgment' reversed.

 Catron, J. did not sit in this causo.